

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JJD:PGS/JLG/MEF
F. #2016R01021

*610 Federal Plaza*
*Central Islip, New York 11722*

June 15, 2023

By ECF

The Honorable Gary R. Brown
United States District Judge
United States District Court
940 Federal Plaza
Central Islip, New York 11722

      Re:    United States v. Jhonny Contreras
                Criminal Docket No. 16-403 (S-7)(GRB)

Dear Judge Brown:

      On May 17, 2022, the defendant Jhonny Contreras, also known as "Muerte," "Reaper," and "Conejo," a member of La Mara Salvatrucha, also known as the MS-13, a transnational criminal organization, pleaded guilty to Count One, charging Racketeering, in violation of 18 U.S.C. § 1962(c), including racketeering acts charged in connection with the May 26, 2013 murder of Derrick Mayes (Racketeering Act 3B); the May 28, 2013 murder of Keenan Russell (Racketeering Act 4B); a May 2013 conspiracy to commit obstruction of justice (Racketeering Act 5A); and the November 19, 2015 murder of Cesar Rivera-Vasquez (Racketeering Act 8B); and the lesser included offense of Count Nine, charging Possession of Firearms During Crime of Violence, in violation of 18 U.S.C.§ 924(c)(1)(A)(i). The defendant is scheduled to be sentenced on June 20, 2023.

      According to the Probation Department, the defendant's total offense level is 43, and he should be sentenced within Criminal History Category IV, which yields an advisory Guidelines sentence of life in prison. Pre-Sentence Investigation Report ("PSR") at ¶ 161. In addition, Count Nine carries a mandatory minimum term of 60 months' imprisonment that must run consecutively to any sentence imposed on Count One. The Guidelines calculation set forth in the PSR is the same as that set forth in the plea agreement between the defendant and the government with one exception, the plea agreement contains a provision for a 1-point global plea reduction, which the government will recommend the

Court adopt at sentencing (see Plea Agreement at ¶ 2).  Should the Court apply the global plea reduction, the advisory Guidelines range will be 420 months to life imprisonment.[1]

On May 5, 2023, the defendant submitted a sentencing memorandum ("Def. Mem.") wherein he requested a sentence of 300 months – well below the advisory Guidelines range in the plea agreement of 420 months to life in prison.  Def. Mem. at 10-11. For the reasons set forth below, the government respectfully submits that, after considering the factors set forth in 18 U.S.C. § 3553(a), in particular, the seriousness of the offense conduct, the need for deterrence, and the need to provide a just punishment for the defendant's crimes, the Court should sentence the defendant to 40 years in prison, which is within the stipulated Guidelines calculation set forth in the plea agreement.

**I.      Background**

The defendant's arrest and conviction resulted from an investigation by the Federal Bureau of Investigation's Long Island Gang Task Force (the "Task Force") into a series of violent crimes committed by members of the MS-13 street gang.  The defendant, who is a self-admitted member of the Brentwood Locos Salvatruchas ("BLS") clique of the MS-13, and dozens of other MS-13 gang members have been charged and convicted in a series of indictments with a litany of violent crimes, including 18 murders and numerous attempted murders and assaults in this case.

      A.      May 26, 2013 Murder of Derrick Mayes (PSR at ¶ 20)

In the Spring of 2013, the defendant was an associate of the BLS clique of the MS-13 and seeking to become a full-fledged member of the gang by achieving the rank of "homeboy."  In order to attain this elevated status in the gang, the defendant had to kill rival gang members.  To that end, on May 26, 2013, the defendant and another MS-13 member agreed to drive around the communities of Brentwood and Central Islip hunting for rivals to kill.  Contreras and the other gang member were armed with a .25 caliber handgun and 20-gauge shotgun, respectively, and driving a minivan that the defendant had recently stolen. While on Wilson Boulevard in Central Islip, the pair of MS-13 members observed the victim Derrick Mayes walking along the street.  Although they did not recognize him, the MS-13 members targeted the victim based on the fact that he was African-American and that he was wearing red clothing.  The defendant parked the minivan, both gang members got out of the vehicle and approached the victim.  Once in close range, the other MS-13 member fired several rounds from the 20-gauge shotgun, striking Mayes in the torso.  The defendant attempted to fire his handgun at the victim while he was lying on the ground, but the firearm

---

[1] The defendant has raised several objections related to the Guidelines calculation and criminal history set forth in the PSR.  Given the fact that the Guidelines range outlined in the PSR and the plea agreement ultimately end up being identical (before applying the 1-point global plea reduction), the government does not address or take a position with the respect to the defendant's objections.  Furthermore, the defendant stipulated to the Guidelines calculation set forth in the plea agreement.

jammed.  Both ran back to the minivan and fled the scene.  Mayes died of his wounds before paramedics could arrive.  There is no evidence that Mayes was associated with the Bloods or any other street gang.

      B.      May 28, 2013 Murder of Keenan Russell (PSR at ¶ 21)

The day after killing Mayes, the defendant and several other MS-13 members again agreed to drive around hunting for rivals to kill.  After an initial attempt was unsuccessful, the gang members learned of a house party they were told was at rival Blood member's home.  Just after midnight on May 28, 2013, the MS-13 members separated into two cars and drove to the suspected rival's house in Central Islip.  The defendant, again armed with the .25 caliber handgun, was in the stolen minivan with two other gang members, one armed with the 20-gauge shotgun and the other a 9mm handgun.  After locating the target home on Acorn Avenue in Central Islip, the gang members parked the minivan got out of the vehicle and approached a group of individuals that included males and females, who were standing outside of the house.  All three MS-13 members, including the defendant, began shooting at the people in front of the house.  Keenan Russell was struck three times with the 20-gauge shotgun and died at the scene.  The defendant and other MS-13 members fired numerous times at the other victims as they ran for their lives.  Thankfully, no one else was injured.  During the subsequent investigation, one .25 caliber bullet and two .25 caliber shell casings were recovered at the scene.   There is no evidence that Russell was associated with the Bloods or any other street gang.

      C.      May 2013 Conspiracy to Obstruct Justice (PSR ¶ 22)

Following the murders of Mayes and Russell, the defendant and his fellow gang members learned that there was information regarding a minivan that was observed leaving the scene of both shootings that was posted to social media.  The defendant and several other MS-13 members agreed to destroy the minivan so it could not be located and linked to them in connection with the murders.  On May 30, 2013, the defendant and two other gang members bought gasoline and drove the minivan into a wooded area behind Contreras' apartment building in Ronkonkoma.  They wiped the minivan to remove any fingerprints and then the defendant drove the van deeper into the woods and set it on fire.  The local fire department and Suffolk County Police Department ("SCPD") responded and subsequent investigation determined that the minivan had been destroyed by arson started by gasoline.

      D.      November 19, 2015 Murder of Cesar Rivera-Vasquez (PSR ¶ 28-29)

On November 20, 2015, Cesar Rivera-Vasquez was reported missing to the SCPD by a family member who last reported him seen on November 18, 2015.  Initial investigation of the report determined that the victim left a deli in Babylon (the "Deli") close to midnight on November 18, and got into a white sedan with two other men, one of whom was Reynaldo Lopez-Alvarado, also known as "Mente," a member of the BLS clique.

Further investigation determined that the victim was killed by five members of the MS-13, including the defendant, Lopez-Alvarado and Jeffrey Amador, also known as "Cruel." The victim was targeted because the defendant and his fellow gang members suspected Rivera-Vasquez of being a member of the rival gang Roza Loca. On the night of the murder, the defendant and Lopez-Alvarado encountered the victim at the Deli. The defendant started speaking to the victim, who was intoxicated. During their conversation, the victim told the defendant that he was a member of Roza Loca. Thereafter, the defendant and Lopez-Alvarado contacted other MS-13 members, including Amador, and began to form a plan to kill Rivera-Vasquez. The MS-13 members convinced the victim to leave with them by promising to sell him cocaine. The victim left the Deli with the defendant, Lopez-Alvarado and another MS-13 member. They drove the victim a short distance to a secluded area behind a baseball field where they were met by Amador and another gang member. The MS-13 members were armed with a baseball bat and knives. The MS-13 members surrounded the victim and Lopez-Alvarado told the victim to take off his shirt so they could look at his tattoos. After seeing a tattoo that demonstrated his membership in the rival gang, the defendant struck the victim with the baseball bat and the other gang members began stabbing him repeatedly with knives. Despite his injuries, the victim did not succumb to the ongoing attack until Lopez-Alvarado took a knife a cut his throat. Once he was dead, the MS-13 members buried the victim's body near a large mound of dirt where it was later discovered by the Task Force in April 2018.

E.   The Defendant's Arrest

The defendant was taken into federal custody and charged in the instant case on July 25, 2016, after being transferred from a state facility in Riverhead, New York, where he was being held in connection with a state parole violation. PSR at ¶ 65.

**II.   The Defendant Should be Sentenced to 40 Years in Prison**

For the reasons set forth below, the government respectfully submits that the defendant should be sentenced to 40 years in prison.

A.   Legal Standard

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines were no longer mandatory, but should be considered in conjunction with the factors outlined in § 3553(a). Thereafter, the Supreme Court confirmed that § 3553(a) requires a sentencing court to give respectful consideration to the Guidelines, but Booker allows the court to "tailor the sentence in light of other statutory concerns[.]" Kimbrough v. United States, 552 U.S. 85, 101 (2007) (citing Booker at 245-46 and Gall v. United States, 552 U.S. 38, 46-49 (2007)). However, the Supreme Court explained that even though the Guidelines are now advisory, "district courts must treat the Guidelines as the 'starting point and the initial benchmark'" when determining a defendant's sentence. Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)).

4

With the Guidelines as the "starting point and the initial benchmark," the Court should next consider the factors set forth by Congress in § 3553(a).  Id.  That statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and
>
> (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3553(a)(1) and (2).

B.   Analysis

Here, pursuant to the recent decisions of the Supreme Court, the Court's "starting point and the initial benchmark" should be the advisory Guidelines range of 420 to life in prison.  Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)).  In light of the sentencing factors set forth by Congress in § 3553(a), the government respectfully submits that the defendant should be sentenced to 40 years in prison.

As an initial matter, with respect to § 3553(a)(1), the seriousness of the defendant's conduct cannot be overstated and weighs heavily in favor of a significant sentence in this case.  In furtherance of his zealous ambition to prove himself and increase his status in the MS-13, the defendant participated in the senseless murders of two unarmed, unsuspecting and completely innocent victims, Mayes and Russell.  These cold-blooded murders may have been random acts with respect to the victims who were killed, but they were emblematic of the terror and violence that this defendant and the BLS clique sought to inflict upon the residents living in Brentwood and Central Islip during that time.  The defendant's crimes are made even more serious because Mayes and Russell were targeted based on nothing more than the color of their skin, which led the defendant and the other MS-13 members to speculate that they were rivals.  Indeed, the only transgression committed by these two young men on the evening of their deaths was unwittingly crossing paths with the defendant and his fellow gang members.  As a result, their lives were abruptly and tragically cut short leaving their families with a lifetime of pain and suffering.   Thereafter, despite being promoted for his participation in the murders of Mayes and Russell, the defendant's desire to kill for the gang was not satisfied.  The defendant saw an opportunity to further carry out the mission of the MS-13 in Rivera-Vasquez, whom he marked for death after learning that the victim might have been a rival gang member.  The defendant took a lead role in both the planning and execution of the murder, as the first MS-13 member to

5

identify him as a rival and the first to attack the victim, striking him with a baseball bat. Accordingly, the nature and circumstances of the offense conduct warrants a severe sentence in this case.

Furthermore, when determining an appropriate sentence, due consideration must be given to the consequences of the defendant's actions, particularly for the victims' families. With respect to the Mayes and Russell families, the loss of their loved ones has had a devastating effect on both families, yet each have demonstrated unwavering devotion to their loved ones and commitment to seeing the legal process through to the end. They have, without exception, appeared at every in-person court appearance since charges were filed seven years ago, in June of 2016, despite the pain and anguish that inevitably resurfaces with each court conference. Although the government has had limited contact with the Rivera-Vasquez family during the pendency of this case, the loss of a loved one is always traumatic and a significant sentence has to address the lifetime of suffering for the friends and family members of all three of the defendant's victims.

In his sentencing memorandum, counsel for the defendant addresses his role in the three murders for which he now awaits sentence, stating that the defendant, "was not the person who actually made the final act that resulted in the death of any of these people." Def. Mem. at 2-3. While true, in a manner of speaking, the statement, on its face, does not accurately describe the defendant's extensive involvement in each of the murders. For instance, although the defendant did not shoot Mayes, it was not for a lack of trying. After his fellow gang member shot Mayes, the defendant attempted to shoot the victim as he fell to the ground, but was unable to because the gun jammed. A little over 24 hours later, the defendant had the same gun when he and the other MS-13 members attacked a group of innocent, unsuspecting male and female victims. This time the defendant fired several times before his gun jammed again. Luckily, he missed his intended targets. However, in both instances, the defendant was armed and agreed with the other MS-13 members to attack and kill innocent people. True to that commitment, he tried to shoot and kill both Mayes and the victims outside of the target house where Russell was murdered the following evening. Although no one was struck by a bullet fired from the defendant's gun, he had every intention of killing multiple people and was a vital part of the collective effort that resulted in the deaths of Mayes and Russell. Accordingly, the defendant's role in these murders is not worthy of any significant consideration as a mitigating factor. Nor should the defendant be credited for not being the one who cut Rivera-Vasquez's throat when he and the other gang members became frustrated with how long the victim was taking to die. The defendant was the one who first identified the victim as a rival, setting in motion the events that led to his death. He was also a hands-on participant and the first to strike the victim, hitting him in the head with a baseball bat. Indeed, according to the autopsy report, the victim died of blunt force trauma and multiple stab wounds, thus, the defendant is arguably the most culpable participant in the Rivera-Vasquez murder.

The defendant's history and characteristics also weigh in favor of a significant prison sentence. While out on the street, the defendant was a devoted member of the MS-13. As detailed herein, he participated in three murders as part of his steadfast commitment to the

6

MS-13 and its mission to commit brutal acts of violence and terrorize the communities where they operate. The defendant asserts several arguments related to his background and current status in arguing for a sentence well-below the Guidelines. First, the defendant cites to his difficult and unstable upbringing, that included, <u>inter alia</u>, an abusive father and an unsettled living situation throughout his life, which caused him to join the MS-13 to "feel accepted and loved." Def. Mem. at 5. Regarding defendant's personal background, the government does not dispute that the defendant grew up under difficult circumstances, however, the defendant's background is unfortunately not unlike many individuals in this country who have experienced significant hardship early in life, but do not join violent street gangs like the MS-13. Furthermore, unlike many other similarly situated MS-13 co-conspirators, who faced even more difficult upbringings in Central America, the defendant was born in the United States and, thus, not exposed to the same level of brutal violence committed by the gangs and drug cartels that control and terrorize so many communities in those countries. Instead, he had the opportunity to receive a quality education and lead a law-abiding life as a productive member of society. Indeed, the defendant excelled at soccer and had multiple opportunities to use his athletic abilities as a path towards a better life, but he squandered them and instead chose to join MS-13. Def. Mem. at 5-6; Exhibit A to Def. Mem. at 10-11.

   The defendant further argues that he is a changed man, who is now committed to his religious faith and is completely separated from the MS-13. Def. Mem. at 8; Exhibit A to Def. Mem. at 12-13. At the outset, the government does credit these assertions, which are supported by jail records and information from cooperating defendants who have had direct contact with the defendant. The government further believes that the defendant's expressions of remorse for the crimes he has committed are sincere. Were it not for these factors, the government would be recommending a more severe jail sentence. However, these recent changes do not erase the years of damage and suffering the defendant caused as a member of the MS-13, and analysis of the other § 3553(a) factors support a significant sentence in this case.

   Thus, the "nature and circumstances of the offense" and the "history and characteristics" of the defendant warrant a sentence of 40 years in prison, pursuant to § 3553(a)(l).

   The Court must also consider the factors set forth in § 3553(a)(2)(A)-(C), which provide that a sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). These factors also weigh in favor of a significant sentence.

   First, with respect to factor § 3553(a)(2)(A), for the reasons set forth above, the murders of Mayes, Russell and Rivera-Vasquez are extremely serious offenses and need to be adjudicated in a manner that will promote respect for the law and provide just punishment for the offenses. As previously stated, the offenses are more serious because they were committed in furtherance of the MS-13 racketeering enterprise by the defendant and other members and associates of the BLS clique.

Second, in regard to factor § 3553(a)(2)(B), affording adequate deterrence to criminal conduct, Long Island has been plagued by gang violence for well over a decade. In the instant indictment alone, MS-13 members were indicted on charges relating to 18 murders between May 2013 and April 2017, and numerous other violent crimes. A 40-year prison sentence would send a strong message that violent conduct such as that engaged in by the defendant and his fellow MS-13 gang members will not be tolerated.

Third, pursuant to § 3553(a)(2)(C), it is essential that the Court's sentence "protect the public from further crimes of the defendant." Although the government acknowledges the positive steps taken by the defendant since his federal incarceration and is extremely hopeful that he continues down that path, the brutal violence he perpetrated as a member of the MS-13 cannot not be ignored. It is a well-established reality that someone who has committed extreme acts of violence over an extended period of time, such as the defendant, is at a significantly greater risk of being a recidivist and committing additional violent crimes in the future.

### III. Conclusion

For the reasons set forth above, and in light of the § 3553(a) factors, the government respectfully submits that the Court should sentence the defendant to 40 years in prison.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/ Paul G. Scotti
Paul G. Scotti
Justina L. Geraci
Megan E. Farrell
Assistant U.S. Attorneys
(631) 715-7836/7835/7862

cc:   Andrew G. Patel, Esq. (By ECF and E-mail)
Donald J. Yannella, Esq. (By ECF and E-mail)
Clerk of the Court (GRB)(By ECF)